UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.                                                    )<br>                                                         )     Crim. No. 17-201 (ABJ/DAR)<br>PAUL J. MANAFORT, JR. and          )<br>RICHARD W. GATES III,                   )<br>                                                         )<br>            Defendants.                         ) | |

### DEFENDANT PAUL J. MANAFORT, JR.'S
### MEMORANDUM REGARDING CONDITIONS OF RELEASE

Paul J. Manafort, Jr., by and through counsel, submits this memorandum in response to the Government's Memorandum in Support of Conditions of Release, Complex Case Designation and Notice of Intent to Use Certain Bank Records ("Government's Memorandum"), filed on the evening on October 31, 2017. A status conference before this Court has been scheduled for November 2, 2017.

I.      Background

On October 30, 2017, at his initial appearance in this matter, U.S. Magistrate Judge Robinson released Mr. Manafort on an unsecured bond in the amount of $10 million and home confinement, among other conditions. Mr. Manafort's release was subject to this Court's consideration of the release conditions at the status conference set for November 2, 2017.

It is important to note at the outset what is *not* at issue. The parties agree that Mr. Manafort is not a danger to the community. (Government's Memorandum at 4). And although the parties disagree as to the potential risk of flight posed in this case, as discussed *infra*, the Government itself acknowledges that "release subject to significant financial and other conditions will reasonably assure [Mr. Manafort's] appearance as

1

required by law." (Government Memorandum at 17). That is, detention has not been requested by the Government, nor could it have been under the facts of this case.

    II.    <u>Discussion</u>

The thrust of the Government's Memorandum is directed at persuading the Court that "substantial" bail conditions are necessary to ensure Mr. Manafort's appearance because he poses a "serious" risk of flight. (Government's Memorandum at 4–5). The defense disagrees and contends that the continuation of the $10 million unsecured appearance bond, subject to the condition that he not commit a federal, State, or local crime during the period of release, will more than suffice. *See* 18 U.S.C. §§ 3142(a)(1), (b).

For many years, Mr. Manafort has been a successful, international political consultant. Over that time, he has traveled frequently and represented many foreign businessmen and commercial interests around the world—conduct which is completely legal. The Indictment in this matter, however, focuses specifically on Mr. Manafort's work on behalf of certain Ukrainian clients. This work began more than ten years ago and concluded around the end of 2014.[1] Mr. Manafort's work in this regard was open, public, and well-known within the political consulting community.

More particularly, Mr. Manafort advised certain Ukrainian political parties that oftentimes promoted closer ties with the European Union. During this time, Mr. Manafort conducted his consulting business through his company, DMP International ("DMP"). Mr. Gates, a co-defendant in this case, was an employee of DMP. The Government alleges a "complex web of international financial transactions," *see*

---

[1] Of note, his work on behalf of these Ukrainian clients ended approximately two years before Mr. Manafort agreed to work on the campaign of President Trump.

Government Memorandum at 7, but the entities and bank accounts were opened in Cypress to conduct the international consulting business of DMP. It is axiomatic that work performed on behalf of foreign parties will necessarily involve "international financial transactions." The funds deposited in the Cypress accounts were from legal sources.

Further, in discussing the alleged "flight concerns" that these international transactions raise, two additional points must be made. First, the Government specifically acknowledges that the funds went from Ukraine through Cypress *to the United States*. (*See* Government Memorandum at 7). Obviously, international funds entering the U.S. banking system, or going to U.S. vendors, are traceable and subject to U.S. process. It goes without saying that in an international scheme to conceal assets, individuals generally move them offshore, not to the United States. Second, the Office of Special Counsel has subpoenaed numerous documents from DMP and others and is aware that the Cypress accounts are either closed or have relatively nominal balances. The majority of Mr. Manafort's assets—primarily real estate—are in the United States, not overseas, and the Government knows this.[2]

The Office of Special Counsel concedes that Mr. Manafort—a lifelong U.S. citizen—has no criminal history and possesses significant ties to the communities where he lives and owns property. (Government Memorandum at 10). To posit that he nevertheless poses a "serious" risk of flight because he is 68 years old and, therefore, under the Government's theory could potentially spend most of the remainder of his life

---

[2] The Indictment also contains a count seeking forfeiture of approximately $18,000,000, an amount which would wipe out a substantial portion of Mr. Manafort's wealth. Mr. Manafort is ready to defend these allegations and preserve his livelihood and his assets.

in prison, completely ignores his strong family ties.  Apparently, the Government Memorandum seeks to persuade this Court that Mr. Manafort is a serious risk to simply up and leave his wife of almost 40 years, his two daughters, and his grandchildren, so that he can live the rest of his life on the lam.[3]  This is an imagined risk; it is not real.

The weight of the evidence outlined against Mr. Manafort has also been embellished.  The Indictment reads like a criminal tax case against Mr. Manafort, yet there are no Title 26 (Internal Revenue Code) counts to be found anywhere in the charging document.  (See Government's Memorandum at 3–4).  There is loose talk of falsely reporting income, etc., but no tax offenses have been propounded.  In fact, the primary case relied upon by the Office of Special Counsel to argue that there is a serious risk of flight is a charged criminal tax case, *United States v. Anderson*, 384 F. Supp. 2d 32 (D.D.C. 2005).  That case, too, involved a U.S. citizen with considerable wealth, but all of Anderson's assets (both inside and outside the United States) were held in the name of third-party nominees, or through bearer shares, with the intent to conceal those assets from the Internal Revenue Service.  Unlike Mr. Manafort, Anderson had substantial sources of income and assets outside of the United States.  In addition to his U.S. passport, Anderson also held a Latin American passport and a European passport in fictitious names.  Mr. Manafort only possesses passports in his name.  Anderson was also found to possess books regarding concealing one's identity and fleeing the country, and he had no spouse or children.  All of this is in stark contrast to Mr. Manafort's situation.

---

[3] Given the substantial media coverage surrounding Mr. Manafort and this investigation, it is fair to say that he is one of the most recognizable people on the planet today.  Query where such an individual could even hide?

The Government's case also concerns whether Mr. Manafort was required to file a report as a foreign agent with the U.S. Department of Justice. The U.S. Department of Justice has only brought six criminal FARA prosecutions since 1966 and it has secured only one conviction during this period. It is far from clear what activity triggers a requirement to file a report as a foreign agent. In order to conceal this weakness in the Indictment, a façade of money laundering has been put forth using a tenuous legal theory. When the money laundering count is peeled back from the Indictment, the forecasted sentencing guidelines are reduced substantially to a fraction of those claimed by the Office of Special Counsel.

It is further worth considering in the Government's Memorandum the citation to and attachment of a court opinion from an *ex parte* grand jury proceeding in which the district judge found a *prima facia* showing that the crime-fraud exception applied. As the Court is aware, that was a substantially lesser burden of proof to meet than which the Office of Special Counsel is now faced; *i.e.,* proof beyond a reasonable doubt. Indeed, to argue that a decision made on evidence that the defense was not even allowed to see and contest establishes the strength of the case against Mr. Manafort is simply not credible.

III.     Conclusion

Mr. Manafort has been aware of the Office of Special Investigation for many months. FBI agents executed a "no-knock" search warrant at his Virginia residence in the pre-dawn hours in July of this year. Just so there was no misunderstanding, his former counsel was told by the Government prosecutors in August that they were going to indict him. During this investigation period, Mr. Manafort traveled overseas on business and, to no one's surprise, he returned to the United States. Mr. Manafort's

assets, many of which are identified in the Indictment and the Government's Memorandum, are in the United States and traceable to him. As a U.S. citizen, Mr. Manafort only has U.S. passports in his name. Although it might be surprising to some, it is perfectly permissible to have more than one U.S. passport, as individuals who travel abroad extensively no doubt know. Mr. Manafort has strong family and community ties and does not pose a serious risk of flight. The continuation of the $10 million unsecured appearance bond, subject to the condition that he not commit a federal, State, or local crime during the period of release, will more than suffice to assure his appearance as required. *See* 18 U.S.C. §§ 3142(a)(1), (b).

Respectfully submitted,

/s/ Kevin M. Downing
Kevin M. Downing, D.C. Bar No. 1013984
Thomas E. Zehnle, D.C. Bar No. 415556
815 Connecticut Avenue, N.W.
Suite 730
Washington, D.C. 20006
(202) 754-1992

Dated: November 2, 2017