UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 17-201 (ABJ/DAR) |
| PAUL J. MANAFORT, JR. and | ) |
| RICHARD W. GATES III, | ) |
| | ) |
| Defendants. | ) |

### DEFENDANT PAUL J. MANAFORT, JR.'S
### MOTION TO MODIFY CONDITIONS OF RELEASE

Paul J. Manafort, Jr., by and through counsel, hereby moves this Court to modify the conditions of release imposed by U.S. Magistrate Judge Robinson on October 30, 2017, as outlined below. Counsel for Mr. Manafort and the Office of Special Counsel have conferred since the status conference before this Court on November 2, 2017, and Mr. Manafort has proposed a substantial bail package that, per the Bail Reform Act, will reasonably assure his appearance as required. *See* 18 U.S.C. Section 3142. A net worth statement of assets and liabilities has been provided to the Government, and Mr. Manafort is currently gathering supporting documentation for the Government's review; however, because this documentation has not yet been secured over the weekend, there is no agreed-upon bail package at the time of this filing.

I.     Background

On October 30, 2017, at his initial appearance in this matter, U.S. Magistrate Judge Robinson released Mr. Manafort on an unsecured appearance bond in the amount of $10 million and home confinement, among other conditions. Although not raised or requested by the Government or the U.S. Magistrate Judge as part of Mr. Manafort's conditions of release, the Pretrial Services Agency indicated that, under its internal

protocols, home confinement would also require the person to be subject to electronic (GPS) monitoring.

It is important to emphasize, therefore, that the U.S. Magistrate Judge and the Government did not independently seek electronic monitoring of Mr. Manafort[1]; rather, it was only after being advised of this administrative protocol that the parties agreed to what was believed to be a temporary condition of release, and U.S. Magistrate Judge Robinson indicated that the home confinement/electronic monitoring condition (as well as the other release conditions) could be raised with the Court at the status conference scheduled for November 2, 2017.

As the Court is aware, this issue was addressed at the conference held on November 2, 2017, and the parties were ordered to make formal motions should either wish to modify the previously established conditions of release set by U.S. Magistrate Judge Robinson. The Court thereafter granted Defendant Manafort's motion for an extension of time to file this motion to modify conditions of release until 5:00 p.m. on November 4, 2017. The Government was likewise provided additional time to file until 5:00 p.m. on November 5, 2017. The bond review hearing is scheduled for 9:30 a.m. on November 6, 2017.

Counsel for Mr. Manafort and the Office of Special Counsel have been discussing a potential agreed-upon bail package recommendation but, as noted above, securing the additional documentation for the values of Mr. Manafort's assets and liabilities over the

---

[1] The Government indicated at the initial appearance before U.S. Magistrate Robinson that they would be working on a bail package focused on significant financial security and other conditions that would reasonably assure Mr. Manafort's future appearances. *See also* Government's Memorandum in Support of Conditions of Release, Complex Case Designation and Notice of Intent to Use Certain Bank Records [14] (Government's Memorandum) at 17.

weekend has proven problematic. Accordingly, in order to meet today's 5:00 p.m. deadline, Mr. Manafort is filing this motion to modify his conditions of release without any formal agreement with the Government. The defense contends that, nevertheless, the recommended bail package will reasonably assure the defendant's appearance as required under the Bail Reform Act.[2] *See* 18 U.S.C. Section 3142(c)(1)(B). Although the parties differ as to potential risk of flight posed by Mr. Manafort, the weight of the evidence against him, and his personal characteristics (among other things), the Government has previously stated that a package which includes "substantial financial conditions and travel restrictions, among others" would mitigate its perceived risk of flight. (Government Memorandum at 13). Taking this into account, in addition to the Court's comments at the November 2, 2017, status conference, counsel for Mr. Manafort recommends the package of release conditions to the Court described *infra*.

II.   Discussion

For many years, Mr. Manafort has been a successful domestic and international political consultant. Over that time, he has traveled frequently and represented businessmen, political parties, and commercial interests around the world. This conduct is completely legal. The Indictment in this matter focuses on Mr. Manafort's work on behalf of certain Ukrainian clients. His work in this regard began more than ten years ago and concluded around the end of 2014[3]; it was open and well-known, especially within the political consulting community.

---

[2] The Government agrees that Mr. Manafort is not a danger to the community and it has not requested detention. (*See* Government's Memorandum at 4, 17).

[3] Of note, his work on behalf of the Ukrainian clients ended around two years before Mr. Manafort agreed to work as the campaign manager for then-candidate Donald Trump.

More particularly, Mr. Manafort advised certain Ukrainian political parties that oftentimes promoted closer ties with the European Union (EU) and the West, despite reports to the contrary. During this time, Mr. Manafort conducted his consulting business through his company, DMP International ("DMP"). Mr. Gates, a co-defendant in this case, was an employee of DMP. The entities and bank accounts that were opened in Cyprus were to conduct the international consulting business of DMP. It goes without saying that work performed on behalf of foreign clients will often involve international financial transactions.

The funds deposited in the Cyprus accounts were from foreign clients for work that was legal and, as the Indictment itself alleges, the funds were brought back to the United States.[4] International funds entering the U.S. banking system or going to U.S. vendors are traceable and subject to U.S. process. Over the last few years, the cross-border financial activities of U.S. citizens have been under scrutiny, but it is fair to say that the focus is on U.S. individuals who move their funds offshore to conceal it from the government, not the other way around.

To be clear, the defense is not suggesting that consideration of a defendant's foreign assets is inappropriate with respect to fashioning conditions of release; however, the Cyprus accounts which are the focus of this case have been closed or have relatively nominal balances because the work for the Ukrainian clients was essentially concluded by the end of 2014. The Office of Special Counsel has subpoenaed numerous documents from DMP (and others) and can verify this with the company's records. Simply stated,

---

[4] The Government acknowledges that the funds generally went from Ukraine through Cyprus to the United States. (*See* Government Memorandum at 7).

Mr. Manafort's assets—primarily real estate—are in the United States, except for some nominal accounts balances in Cyprus, and the Government has those records.[5]

Likewise, the defense does not contend that a person's foreign travel is irrelevant to determining conditions of release, but things must be kept in perspective. Mr. Manafort has been providing consulting services for international clients for many years and no one disputes this fact. It would be odd, indeed, if he did *not* frequently travel, both domestically and abroad, given his clientele and the nature of his business. Simply put, one's frequent flyer status should not be over-emphasized to show a potential risk of flight when a person's job requires extensive travel.

Along these travel-related lines, much has been made of Mr. Manafort's possession of three different passports. (*See* Government Memorandum at 12, n.5). While some reports have painted this as though Mr. Manafort is akin to a 68-year-old "Jason Bourne" character, the facts are much more mundane. Mr. Manafort possessed a passport, the type of which is generally held by most U.S. citizens. He also possessed a second passport to submit with visa applications to certain foreign countries. (The process for obtaining a visa can sometimes be lengthy and U.S. citizens who travel abroad frequently are no doubt familiar with this circumstance.) The third U.S. passport was applied for and obtained by Mr. Manafort only after he lost his primary passport. Months later, Mr. Manafort found that passport and contacted his passport services agency to advise them, and the U.S. State Department, with respect to the same. Counsel

---

[5] Indeed, the Indictment seeks criminal forfeiture of approximately $18,000,000 of these U.S. assets, an amount which would wipe out a substantial portion of Mr. Manafort's wealth accumulated over a lifetime of work.

for Mr. Manafort is prepared to present documentation to the Court in this regard at the Court's request.[6]

The Office of Special Counsel concedes that Mr. Manafort—a lifelong U.S. citizen and resident—has no criminal history and possesses significant ties to the communities where he lives and owns property. (*See* Government Memorandum at 10). He has been married to his wife for almost 40 years, and has two daughters and two grandchildren also living in the United States. His primary assets, as noted above, are in the United States.

The parties disagree as to the weight of the evidence outlined against Mr. Manafort. Although the Indictment reads like a criminal tax case, there are no Title 26 (Internal Revenue Code) counts in the charging document. The Indictment primarily focuses on Mr. Manafort's efforts on behalf of certain Ukrainian clients, and it makes a broad charge of "conspiracy against the United States." There are additional charges based on an extremely novel reading of the money laundering statute, alleged FARA reporting violations that have been rarely pursued (or successfully prosecuted) in a criminal case, purported false or misleading statements made to the Department of Justice's FARA unit as the parties attempted to determine what reporting was appropriate, and alleged willful violations of the Bank Secrecy Act. At this stage of the case, discovery has not been provided by the Government to the defense so assessing the

---

[6] Similarly, Mr. Manafort's use of a phone registered in an alias (his brother's name) in China and elsewhere has been noted in filings, *see* Government Memorandum at 10, n.3, and blown out of proportion in subsequent reporting. Given the high-profile nature of some of Mr. Manafort's clients, attempting to maintain confidentiality of communications is not surprising at all. Indeed, it is common practice for many U.S. citizens who travel abroad on business and pleasure to defend themselves against potential hacking, and confiscation, of their electronic devices and data. Viewed in its proper context, this does not evidence a heightened potential for risk of flight.

weight of the evidence against the defendant generally involves evaluating the strength of the *allegations* contained in the Indictment. In this regard, there is much to question regarding the legal theories and the purported facts behind these charges.

The primary case relied upon by the Government to argue that there is a serious risk of flight is *United States v. Anderson*, 384 F. Supp. 2d 32 (D.D.C. 2005). That case, too, involved a U.S. citizen with considerable wealth, but all of Anderson's assets (both inside and outside the United States) were held in the name of third-party nominees or through so-called bearer shares, with the intent to conceal those assets from the Internal Revenue Service. Unlike Mr. Manafort, Anderson had substantial sources of income and assets outside of the United States. In addition to his U.S. passport, Anderson also held a Latin American passport and a European passport in fictitious names. As explained above, Mr. Manafort only possesses U.S. passports in his name and he has them legitimately. Anderson was also found to possess books regarding concealing one's identity and fleeing the country, and he had no spouse, children, or any substantial family ties. All of this is in stark contrast to Mr. Manafort's situation.

The parties agree, however, that Mr. Manafort has considerable wealth, accumulated over a lifetime of work, and the defense does not contend that a person's financial resources are irrelevant to considerations of release on bail. *See* 18 U.S.C. Section 3142(g). Accordingly, counsel for Mr. Manafort has provided the Government with a net worth statement approximating his total assets available. (The defense, of course, will provide the same to the Court upon request.) Based on discussions with the Office of Special Counsel, the defense is gathering documentation supportive of the assets and liabilities identified on the net worth statement. Even without a final

agreement with the Government, however, Mr. Manafort will pledge the following assets (and meet the additional conditions noted *infra*) to reasonably assure the Court that he will appear as required:

    ___ East 5th Avenue, New York, NY (approximate net asset value $3 million);

    ___ Baxter Street, New York, NY (approximate net asset value $3.5 million);

    ___ St. James Drive, Palm Beach Gardens, FL (approximate net asset value $1.5 million; and

    A combination of life insurance policies held in trust and/or in his or his wife's name (approximate net asset value $4.5 million)[7]

In addition to the substantial financial assets pledged above, Mr. Manafort will further agree that: certain family members will sign as sureties, where necessary; Mr. Manafort will not apply for any travel documents, such as passports and travel cards (having already surrendered his passports to the United States); Mr. Manafort will limit his travel to the District of Columbia, Florida (his state of residence), Virginia, and New York (where he has substantial business and makes his living); he will not travel overseas; he will report to the Pretrial Services Agency by telephone once per week or as directed; and he will not seek to encumber those assets proposed as part of his bail package.  These substantial financial conditions, travel restrictions, and other conditions of release will reasonably assure[8] Mr. Manafort's appearance as required under 18 U.S.C. Section 3142.

---

[7] Street identifiers and house numbers have been redacted for this filing but have been made available to the Office of Special Counsel and will be made available to the Court, if requested.

[8] "Section 3142 speaks only of conditions that will "reasonably" assure appearance, not guarantee it." *United States v. Xulum,* 84 F.3d 441, 443 (D.C. Cir. 1996) (per curiam).

WHEREFORE, Defendant Manafort moves to modify Mr. Manafort's current conditions of release imposed by U.S. Magistrate Judge Robinson on October 30, 2017, and release Mr. Manafort under the conditions of release set forth above.

Respectfully submitted,

/s/ Kevin M. Downing
Kevin M. Downing, D.C. Bar No. 1013984
Thomas E. Zehnle, D.C. Bar No. 415556
815 Connecticut Avenue, N.W.
Suite 730
Washington, D.C. 20006
(202) 754-1992

Dated: November 4, 2017